Pettit-Galloway Company *v.* Womack.

Opinion delivered February 9, 1925.

1. Estoppel—silence.—For silence to constitute an estoppel, there must be both the opportunity and the duty to speak and the action of the person asserting the estoppel must be the natural result of the silence, and the party maintaining silence must be in a situation to know that some one is relying thereon to his detriment.

2. Estoppel—change in system of heating—acquiescence.— Where plaintiffs contracted to install an overhead heating system in defendant's buildings under direction of his architects, but, on discovering that an up-feed system could be installed for less money with same efficiency, plaintiffs were instructed by the architects to make the change, *held* that defendant, who knew of the proposed change and made no objection, was estopped to refuse to accept same.

3. Contract—conclusiveness of architect's decision.—Where a contract for installing a heating system provided that the architects should have general supervision and direction of the work and decide on all claims of the owner or contractor, the architects'

decision approving the work was conclusive, in the absence of gross mistake or failure to exercise an honest judgment in this matter.

Appeal from Saline Chancery Court; *J. P. Henderson,* Chancellor; reversed.

STATEMENT OF FACTS.

Pettit-Galloway Company brought this suit in equity against Chas. H. Womack to foreclose a mechanic's lien for $3,786.50, alleged to be due it for installing a plumbing and heating system in a theatre and two stores belonging to the defendant. The suit was defended by Womack on the ground that the plaintiff had not complied with its contract in installing the heating plant, and had installed a wholly different system from that provided in the contract.

On October 17, 1919, Pettit-Galloway Company entered into a written contract with Chas. H. Womack of Benton, Arkansas, to supply all the materials and perform all the work necessary to installing a plumbing and heating system in a theatre building and two stores at Benton, Arkansas. The contract recites that it was prepared by Sanders & Ginocchio, who were the architects, and who had prepared the specifications under which the work was to be done.

Section 3 of the specifications, which are made a part of the contract, provides that the work shall be executed in conformity with the drawings and instructions furnished by the architects. It further provides that the architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building.

Section 9 provides that the architect shall have general supervision and direction of the work, and that he is the agent of the owner only to the extent provided in the contract. This section also recites that, inasmuch as the architect is the interpreter of the conditions of the contract and the judge of its performance, he shall side neither with the owner nor with the contractor, but

shall use his powers under the contract to enforce its faithful performance by both.

Section 10 provides that the architect shall make decisions on all claims of the owner or contractor, and on all other matters relating to the execution and progress of the work or the interpretation of the contract documents.

Section 13 provides for an inspection of the work as it progresses by the architect.

Section 14 provides for the removal by the contractor of all work condemned by the architect as failing to conform to the contract, and that the contractor will properly replace such work in accordance with the contract, without expense to the owner.

Section 16 provides that the owner shall give notice of observed defects with reasonable promptness. It further provides that all questions arising under this section shall be decided under §§ 10 and 45. We have already given the substance of § 10. Section 45, when read in connection with § 10, provides the manner in which the architect's decisions are subject to arbitration.

According to the evidence for the plaintiff, what is usually called the overhead heating system was specified in the contract, because the architect was informed that the basement of the building in which the boiler was to be located would not have sufficient drainage to adopt what is called the up-feed system. Soon after the work was started, the representative of Pettit-Galloway Company found that the basement was deeper than the profile showed, and that he could put in the up-feed system of heating. The architect was there, and his attention was called to the matter. He immediately instructed the contractor to install the up-feed system instead of the overhead system. After the up-feed system had been installed, a test was made of it, and Womack told the contractor that he might draw the fires, as it had been demonstrated that it would heat the building. Afterwards he refused to pay the plaintiff for its work on the ground that there had been a change from the over-

head system to the up-feed system and that this change was a material one, and that the up-feed system was not nearly so adapted for the purpose of heating the building as the one he had contracted for.

Four witnesses for the plaintiff, including the firm of architects who had charge of the installation of the system, and the superintendent in charge of the work for the plaintiff, and his foreman, all testified that the up-feed system was more efficient for heating buildings of this character with hot water than the overhead system. It was cheaper, and the contractor had agreed to deduct proportionately the amount provided under his contract. They also testified that there was greater danger of freezing in the overhead system, and that the pipes are exposed on the inside of the building under that system, which tends to make it more unsightly in appearance. They also testified that the change from the overhead to the up-feed system was not a material change, because the main purpose of the installation of the heating system was to heat the building at the least cost.

On the other hand, two experts for the defendant testified that the change from the overhead to the up-feed system of heating was a material one, and that the overhead system was much better than the up-feed system. The witnesses on both sides gave in detail the reasons for their belief in the efficiency of the respective systems. Other testimony will be stated or referred to in the opinion.

The chancellor was of the opinion that the change from the overhead to the up-feed system in the installation of the heating plant was a material change, and that, on this account, the plaintiff was not entitled to recover in the action. From an adverse decree the plaintiff has duly prosecuted an appeal to this court.

*W. R. Donham,* for appellant.

Substantial compliance with the contract is all that is required. Where work has been done in substantial compliance with the terms of the contract, or has been

accepted, the contractor may, notwithstanding defects therein, recover the contract price, less the cost of correcting such defects. 64 Ark. 34; 79 Ark. 506; 97 Ark. 278; 105 Ark. 353; 122 Ark. 308; 147 Ark. 308; 157 Ark. 430. Here, there was not only a substantial compliance with the contract, but there was a literal compliance. No changes were made except those minor changes made by the architects which they were empowered by the contract to authorize. Appellee by his conduct and what he said at the time of the test of the heating system, must be held to have accepted the same.

*Brouse & McDaniel,* for appellee.

The materiality of the change did not consist in the change from the overhead to the up-feed system alone, but also in the manner of the installation of the latter system, in that appellant did not dig out the earth and lower the boiler so as to allow an up-feed system which would have been taken off at the top of the boiler. This resulted in the pipe being carried up under the concrete floor uncovered and exposed to contact with the earth, to dampness and rust; and while the original plan provided for expansion and contraction of the pipes, in the system used the pipes were cemented through the floor, which would necessarily result in breakage through expansion and contraction. The boiler itself was not properly covered according to the contract. There are limitations to the rule as to substantial compliance. The courts will not permit substitutions to be made by contractors or architects. 137 Wis. 169, 24 L. R. A. (N. S.) 327 and notes. When appellant departed from the contract and substituted an up-feed system, it was bound to take notice of the terms of the contract, and see that the change was authorized by the owner and the plans and specifications furnished for the different system. 64 Ark. 34. Use and occupancy of the building by the owner did not constitute a waiver of rights between himself and the contract, nor an acceptance of the heating plant. 16 L. R. A. (N. S.) 489; 69 Atl. 417; 3 Ark. 324.

To constitute substantial performance, a general adherence to the plans prescribed is not sufficient. It is not substantial performance if the builder wilfully, carelessly, or in bad faith fails to perform the contract according to its terms, or leaves the work incomplete in any material respect, or makes deviations or omissions that effect a large saving to himself and consequent loss to the owner, or that in fact substitute a new contract. 6 C. J. 57; 9 C. J. 743-44. Performance is a question of fact. 9 C. J. 748-49 par. 83. This question was submitted to the court upon conflicting evidence, and its findings are final. *Walt* v. *Phillips,* 166 Ark. 163; 163 Ark. 426; *Id.* 634; 161 Ark. 1; *Id.* 504.

HART, J., (after stating the facts). The view we have reached renders it unnecessary to decide whether or not the change from the overhead to the up-feed system was a material one, for the reason that we are of the opinion that, under the facts and attending circumstance, the doctrine of equitable estoppel applies, and the defendant has waived the right to have the overhead system of heating installed.

In discussing the doctrine of equitable estoppel, Professor Pomeroy says that acquiescence consisting of mere silence may also operate as a true estoppel in equity to preclude a party from asserting legal title and rights of property, real or personal, or rights of contract. 2 Pom. Eq. Jur. 3d. ed., § 818. The general doctrine is that, if one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent. In other words, to constitute silence an estoppel there must be both the opportunity and the duty to speak, and the action of the person asserting the estoppel must be the natural result of the silence, and the party maintaining silence must be in a situation to know that some one is relying thereon to his detriment. *Indiana Lumbermen's Mut. Ins. Co.* v. *Meyers Stave & Mfg. Co.,* 164 Ark. 359, and cases cited; and *Brownfield* v. *Bookout,* 147 Ark. 555.

This principle of equity and of natural justice, under the facts and attending circumstances of this case, decides the case against the defendant. The undisputed proof shows that the contract was prepared by the architects of the defendant, and that they were to have general charge of supervising and directing the installation of the heating plant in the theatre and two stores of the defendant. The judgment of the architect about the kind of heating system was taken. The overhead system was adopted because it was understood that the boiler was to be located in the basement, and that it could not be set deep enough in the ground to install the up-feed system and at the same time to get proper drainage. This seems to have been understood by the plaintiff as well as the architect. The superintendent of the plaintiff discovered, before the work of installing the heating system had begun, that the basement would be deeper than the profile showed, and that proper drainage could be secured. He at once informed the architect of this fact. The architect then instructed him to change from the overhead to the up-feed system. It was known that it would cost somewhat less to install the up-feed system than it would the overhead system, and the plaintiff agreed to make a corresponding reduction in its price. The architect does not remember, but thinks that he told the defendant of the change a day or two later. In any event, the foreman of the defendant was told of the change.

It was also shown that the defendant lived in the town where the work was being done, and himself directed the superintendent of the plaintiff to make some minor changes in the work as it progressed. After the heating system had been installed, fires were placed in the engine and the water in the boiler heated for the purpose of testing the plant. The defendant was present, and, after the building had been sufficiently heated, ordered the fires drawn. He was not a witness in the case. Under the circumstances just detailed, it is fairly inferable that he knew that the change from the over-

head to the up-feed system had been made, and that the change was due to the instructions given by his own architect. In the face of these facts, the defendant permitted the plaintiff to go ahead with the installation of the heating system under the changed plans. If he proposed to dispute the rights of his own architect to change the plans under the contract, good faith required that he should have done so before the plaintiff went to the trouble and expense of installing the heating system. The evidence shows that the plaintiff acted in perfect good faith in the matter, and in reliance upon the instructions given its agent by the architect of the defendant. The conscience of the defendant was therefore touched in the matter, and, after allowing the plaintiff to install the changed system without objection on his part, he must be presumed to have consented to the change, and the doctrine of equitable estoppel applies in this case.

Counsel for the defendant also seek to uphold the decree on the ground that the up-feed system was not properly installed, and that, on account of the defects in the work, the plaintiff should not be entitled to recover. On this point the testimony is in direct and irreconcilable conflict. On the part of the plaintiff it was shown by the architect and by the superintendent and foreman of the plaintiff that the work was done in an efficient manner, and that there was no defect in the work, except one minor leak, which they offered to repair. On the other hand, it was shown by the defendant that the system was not properly installed. The witnesses on each side gave in detail their reasons for testifying as they did. Here again it is not necessary to decide where the weight of testimony on this point lies. The contract provides that the architect shall have general supervision and direction of the work. The work was performed according to the architect's instructions and was approved by him. After the defendant refused to pay for the work, the plaintiff offered to make a test of the system and to show the defendant that it had been properly installed, and that it would heat the buildings

in an efficient manner. The contract provided that the architect of the defendant should make decisions on all claims of the owner or contractor. He approved of the work done by the plaintiff, and, as we have already seen, it is fairly inferable that the defendant was present during all the time the heating plant was being installed. The architect's decision is conclusive that the work was done according to the specifications, and there is nothing in the record to show that his decision was the result of gross mistake or the failure to exercise an honest judgment in the matter. *Boston Store* v. *Schleuter,* 88 Ark. 213; *Carlile* v. *Corrigan,* 83 Ark. 136; *Hatfield Special School Dist.* v. *Knight,* 112 Ark. 83; and *Hot Springs Ry. Co.* v. *Maher,* 48 Ark. 522.

The result of our views is that the chancellor erred in rendering a decree in favor of the defendant, and, for that error, the decree must be reversed, and the cause remanded with directions to the chancery court to render a decree in favor of the plaintiff, and for such further proceedings as he may be entitled to in equity.